UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENTON D HUDSON,

                Plaintiff,                         Civil Action No. 5:12-13272

        v.                             District Judge John Corbett O'Meara
                                            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Until December 2009, Plaintiff Trenton Hudson worked as a crane operator at an automotive plant. Years earlier, Hudson began suffering from low-back pain; later he sought treatment for pain in his knees. In January 2009 he reported pain in his arms. The next month, at 37 years of age, Plaintiff was diagnosed with fibromyalgia: a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." S.S.R. 12-2p, 2012 WL 3104869, at *2. Along with allegedly severe pain, Plaintiff experiences headaches and frequent urination, both of which may be related to his fibromyalgia. *See id.* at *3 n.9.

Primarily based on these symptoms, Plaintiff applied for disability insurance benefits and supplemental security income. An Administrative Law Judge acting on behalf of the Defendant Commissioner of Social Security denied these applications. Hudson then appealed here. (Dkt. 1.) Now before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for

summary judgment (Dkts. 10, 14). Having studied the briefs and the administrative record, this Court finds that Plaintiff has not demonstrated that the Administrative Law Judge reversibly erred in assessing the functional limitations attributable to Plaintiff's fibromyalgia. For this reason, and those set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 14) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

On March 1, 2010, Hudson applied for disability insurance benefits and supplemental security income asserting that he became unable to work on December 18, 2009. (Tr. 12.) The Social Security Administration initially denied these applications in June 2010. (Tr. 12.) Hudson then requested an administrative hearing, and on February 11, 2011, he testified about his impairments before Administrative Law Judge Michael R. Dunn. (Tr. 54-88.) In a March 7, 2011 decision, ALJ Dunn, reviewing the initial denial *de novo*, found that Hudson was not disabled within the meaning of the Social Security Act. (Tr. 12-19.) His decision became the final decision of the Commissioner of Social Security on June 19, 2012, when the Administration's Appeals Council denied Plaintiff's request for further review. (Tr. 1.) Plaintiff filed this suit against the Commissioner about a month later. (Dkt. 1, Compl.)

2

**B. Medical Evidence**

*1. Medical Evidence Before the Alleged Onset Date*

Plaintiff sought treatment for conditions related to his claim of disability years before his alleged onset date of December 2009. Plaintiff's treatment prior to 2008 can be briefly summarized as follows. In August 2001, Plaintiff reported to his primary-care physician, Dr. Valerie Hudson, that he had been experiencing back pain off and on for a couple of years. (Tr. 328.) Dr. Hudson prescribed Motrin and kept Plaintiff off work for two days. (*Id.*) In February 2002, Plaintiff returned to Dr. Hudson with back pain. (Tr. 314.) He also reported having to use the bathroom frequently, including six times the night before the exam. (*Id.*) In August 2003, Dr. Hudson noted "chronic L5-S1 problems see MRI" and her diagnoses included "L5-S1 bulging disc." (Tr. 309.) In April 2004, Plaintiff saw Dr. Hudson for headaches. (Tr. 308.) Her notes provide, "[s]tarting a month ago [he] had to start wearing helmets at work—now having bad headaches . . . ." (Tr. 308.) Later that month, Dr. Hudson noted, "headaches much improved on Elavil." (Tr. 306.) In October 2004, Plaintiff reported having "awful" pain in his back and knees and that Motrin (800 mg) was not helping. (Tr. 305.) Dr. Hudson prescribed Ultram and ordered an MRI. (*Id.*) In July 2005, Plaintiff again reported low back and knee pain and that 800 mg of Motrin was not helping. (Tr. 303.) Dr. Hudson prescribed Ultram for home use and Motrin 800 mg for work use. (*Id.*) She also kept Plaintiff off work for a few days and ordered physical therapy. (*Id.*) In October 2007, Dr. Hudson noted "polyuria" and that Plaintiff was having back and knee pain. (Tr. 302.) She ordered x-rays and physical therapy, provided Plaintiff with a walking restriction, and prescribed Naproxen and Flexeril. (Tr. 302.)

In 2008, Plaintiff began reporting increased back pain; accordingly, the Court presents the

records from this period in greater detail. In March, Plaintiff reported back and knee pain and tingling in his right leg below the knee. (Tr. 297.) The pain was so bad, reported Plaintiff, that he was taking his wife's Vicodin. (*Id.*) Dr. Hudson diagnosed back pain, paresthesia, and sciatica (along with anxiety and depression apparently related to work stress or family issues). (*Id.*) Her plan was for Plaintiff to take some time off work and to participate in physical therapy; she also ordered a lumbar-spine MRI and prescribed Elavil, Flexeril, Wellbutrin, and Vicodin. (*Id.*) Nonetheless, at his follow up two weeks later, Plaintiff reported "massive back pain." (Tr. 296.) The MRI revealed a small disc herniation at L5-S1 effacing the thecal sac and some neural foramen encroachment. (Tr. 293.) It also showed diffuse disc bulging at L4-L5 with "a degree" of neural foramen encroachment. (*Id.*)[1]

In July 2008 Plaintiff fell at work which increased his back pain. The next month, on referral from Dr. Hudson, Plaintiff saw Dr. Daniel Elskens, a neurosurgeon, for the first time. (Tr. 370-72.) Plaintiff told Dr. Elskens that his symptoms had worsened over the prior few months. (Tr. 370.) Plaintiff reported his pain at a seven on a ten-point scale. (*Id.*) Heat helped the pain, but Dr. Elskens noted that activity and lying down made it worse. (*Id.*) Plaintiff also reported numbness and tingling in his right thigh, stiffness, and bowel and bladder dysfunction. (Tr. 370.) On exam, Plaintiff had "[f]ull, painless range of motion of the thoracic and lumbar spine." (Tr. 371.) His sensation to touch,

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. The *central canal* of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, Lumbar Spinal Stenosis: Diagnosis and Treatment Options (June 1999); The Cleveland Clinic, Lumbar Canal Stenosis, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_ stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, Herniated Disk, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

4

pressure, and "pinprick" were all intact. (*Id.*) Plaintiff's gait was intact and Faber, Patrick, and straight-leg raising were "normal or negative." (*Id.*) Dr. Elskens ordered an EMG of Plaintiff's right leg and prescribed physical therapy. (*Id.*)

In October 2008, Plaintiff told Dr. Hudson that he fell at work in July and that his back pain had been worse since. (Tr. 291.) Dr. Hudson's plan was to refer Plaintiff for an EMG and physical therapy; she also prescribed Vicodin and increased Daypro, an anti-inflammatory. (*Id.*) Later that month, however, Plaintiff's pain was still "killing" him. (Tr. 290.) Dr. Hudson believed that Plaintiff needed an MRI and a neurosurgical evaluation. (*Id.*)

These two diagnostic studies were performed the following month. EMG results were normal with "no signs of radiculopathy." (Tr. 287.) The radiologist's report states, "small central herniation suggested at L4-L5 and small central herniation at L5-S1 without central canal stenosis though there is bilateral foraminal narrowing." (Tr. 285.)

In January 2009, Plaintiff returned to Dr. Elskens (the neurosurgeon). (Tr. 369.) Dr. Elskens reviewed the MRI and believed it showed "moderate" disc space narrowing at L5-S1, but that Plaintiff's neuroforamina were "patent" and that there was no stenosis. (Tr. 369.) He also remarked, "[Patient] also [complains of] pain in the arms beyond what one would consider from a dehydrated L5-S1 disk." (*Id.*)

The next month, Plaintiff told primary-care physician Hudson that his body ached all over including around his neck, feet, and hands. (Tr. 386.) Dr. Hudson referred Plaintiff to Dr. Samir Yahi, a rheumatologist. (Tr. 286.) With little explanation, Dr. Yahia assessed "[p]olyarthralgia" and concluded that the "[c]linical criteria for fibromyalgia [were] satisfied." (Tr. 223.) Dr. Yahia wanted Plaintiff to take Neurontin and Flexeril at bedtime, begin a stretching program, and, for Plaintiff's

5

lower-back condition, start physical therapy. (*Id.*) Two weeks later, Dr. Yahia's exam revealed "18 tender trigger points." (Tr. 217.)

By the end of 2009, Plaintiff was still experiencing back and knee pain; he also reported right hip and right shoulder pain. (Tr. 276.) Dr. Hudson noted that although Plaintiff was working six days per week, he was "looking at [a] buyout." (*Id.*) Plaintiff reported having pain while operating the crane at work. (*Id.*) Plaintiff also told Dr. Hudson that he had not been sleeping at night. (Tr. 275.)

### 3. Medical Evidence After the Alleged Onset Date

In January 2010, Plaintiff saw Dr. David Gordon, a pain and rehabilitation specialist, for the first time. (Tr. 363.) Dr. Gordon noted that while Plaintiff's MRI revealed degenerative disc disease, it did not show anything "compatible with any acute radiculopathy either in the past or presently." (Tr. 363.) He did note, however, that some recent medical literature suggested that Plaintiff's pain could be in part due to his low bone density. (*Id.*) Plaintiff told Dr. Gordon he was taking four or five Vicodin Extra Strength, Neurontin, and Flexeril, along with Ambien at bedtime. (Tr. 364.) Plaintiff also reported that, while he was "continent," he had some irritable bowel problems including constipation and diarrhea. (*Id.*)[2] On exam, Dr. Gordon found that Plaintiff had a "functional range of motion of all joints in all directions," and, while it was somewhat difficult for Plaintiff to get up from a "low-seated position," Plaintiff could walk "without assistive devices independently." (*Id.*) Dr. Gordon found that Plaintiff was tender at "more than 11 out of 18" trigger points and assessed "[m]ultifocal pain chronically most probably consistent with fibromyalgia." (*Id.*) Dr. Gordon

---

[2]"Irritable bowel syndrome commonly causes cramping, abdominal pain, bloating gas, diarrhea and constipation. Despite these uncomfortable signs and symptoms, IBS doesn't cause permanent damage to [the] colon." Mayo Clinic Website, *Irritable Bowel Syndrome*, http://www.mayoclinic.com/health/irritable-bowel-syndrome/DS00106 (last visited June 21, 2013).

believed that rheumatology screening might be informative and altered Plaintiff's medications. (Tr. 365.) The following treatment goals were identified: eliminating limitations in "day-to-day mobility," diminishing dependence on passive treatments, and becoming independent on a home exercise program. (*Id.*) Dr. Gordon concluded, "The prognosis to the above-mentioned goals with the above-mentioned program, . . . while difficult, I think is good." (*Id.*)

In March 2010, Plaintiff told Dr. Gordon that he had fallen on some ice; Dr. Gordon assessed "contusion and pain of the lower back on top of baseline fibromyalgia as well as degenerative disc disease and spinal stenosis of lumbar spine." (Tr. 362.) He provided Plaintiff with a pain injection. (Tr. 361.) Dr. Gordon wanted Plaintiff to continue with "progressive activity and therapy." (Tr. 362.) Plaintiff was then taking Flexeril and Ambien at night, and 40 mg of OxyContin three times per day. (*Id.*) Four weeks later, Plaintiff reported that his pain had subsided to pre-fall levels. (Tr. 359.) Dr. Gordon again noted more than 11 out of 18 trigger points were tender. (Tr. 359.) He provided, "Regarding medications working toward slowly tapering downward, we will decrease OxyContin [to] . . . 40 mg twice per day and 20 mg at lunchtime. Continuous with the Ambien 10 mg at bedtime and Flexeril 10 mg at bedtime." (Tr. 360.)

In April 2010, Plaintiff underwent a pair of diagnostic exams. An MRI showed a "[s]mall" disc herniation at L5-S1 and "very small" herniation at L4-L5. (Tr. 240.) A bone density study revealed "[l]ow bone mineral density." (Tr. 242.) Other than Plaintiff's low vitamin D (for which he was receiving treatment) the study physician thought that there were no other factors responsible for Plaintiff's low bone density. (*Id.*)

During this time, it appears that Dr. Hudson played a reduced role in Plaintiff's treatment. In March 2010, Dr. Hudson's plan was to order physical therapy, treatment, and an MRI, and to

7

refer Plaintiff to Dr. Gordon, Dr. Yahia, and a "Dr. Maraleins." (Tr. 274.) Similarly, in May 2010, Dr. Hudson's plan was to refer Plaintiff to Dr. Elskens and for Plaintiff to follow up with Dr. Gordon. (Tr. 262.)

Plaintiff returned to see Dr. Gordon in June 2010. (Tr. 357-58.) Plaintiff expressed concerns about his ability to return to work. (Tr. 357.) Upon reviewing the recent MRI and bone density results, Dr. Gordon was a "little bit" surprised that Plaintiff's bone density was more than two standard deviations below average. (*Id.*) On exam, Dr. Gordon again found more than 11 tender trigger points. (*Id.*) He encouraged Plaintiff "to be progressive with regard to activity and function by way of a home exercise program." (*Id.*)

At this visit, Dr. Gordon also informed Plaintiff that the Michigan Automated Prescription System ("MAPS") revealed "some inconsistency with more than one physician and more than one pharmacy." (Tr. 358.) Dr. Gordon explained that this was "a violation of our contract." (*Id.*) He provided Plaintiff with the option of either going on a final taper and detox or deferring to Dr. Hudson. (*Id.*) Plaintiff chose that latter, and Dr. Gordon noted, "I will no longer be prescribing controlled substance." (*Id.*)

Also in June 2010, Dr. Muhammad Mian reviewed Plaintiff's medical file for Michigan's Disability Determination Service. (Tr. 250-57.) Dr. Mian opined that Plaintiff could perform work consistent with the "light" exertional level: lift 20 pounds occasionally, 10 pounds frequently, stand or walk in combination for six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. 250.) The ALJ found, however, that "Dr. Mian misread 11 of 18 trigger

points as 1 of 18 trigger points." (Tr. 17 (citing Tr. 251).)[3]

At the end of June 2010, Plaintiff told Dr. Hudson that OxyContin was too strong and made him vomit. (Tr. 261.) Dr. Hudson discussed the role of an antidepressant in helping with chronic pain. (*Id.*)

Plaintiff's last visit to Dr. Gordon reflected in the record was in August 2010. (Tr. 355-56.) Plaintiff was there for a "recheck regarding multifocal pain, severe and disabling." (Tr. 355.) Dr. Gordon noted that Plaintiff had not started "therapies," apparently referring to the recommended home exercises. (*Id.*) Dr. Gordon again found more than 11 out of 18 tender trigger points. (*Id.*) He assessed, "Chronic and severe multifocal pain that is disabling from his both day to day activities and work activities." (Tr. 355.) He recommended that Plaintiff start the functional therapies and to "move away from passive treatments." (Tr. 356.) He noted, "we do not any longer prescribe controlled substances based on our contract and our last note." (*Id.*)

In September 2010, Dr. Diana Wilsher certified that Plaintiff qualified for medical marijuana treatment due to "[s]evere and [c]hronic" pain. (Tr. 349.)

**C. Testimony at the Hearing Before the ALJ**

Plaintiff testified that he stopped working for several reasons. (Tr. 62.) He stated that he was working more than usual because of a workforce reduction, that he had to stand on cement and "do a lot of moving, stooping, standing," and that he was then in "extreme pain" and "very fatigued." (*Id.*) Plaintiff continued, "at that point I struggled to work and work, and . . . I decided to take the buyout because my pain became so much chronic and severe and disabling that I just couldn't

---

[3]It seems equally likely that Dr. Mian made a typographical error; the parties, however, do not challenge the ALJ's reasonable finding. (*See* Pl.'s Mot. Summ. J. at 5; Def.'s Mot. Summ. J. at 6.)

anymore." (Tr. 62.)

Plaintiff explained that his most disabling condition was pain, and in particular, his lower back pain. (Tr. 63.) Plaintiff described it as follows: "I get a sharp pain constantly down the right back of my leg . . . . [The] pain [shoots] from my back down through my buttocks, all the way down through the bottom to my foot. Constantly. I would say that was probably my most biggest pain. And it hurts all the time." (Tr. 63.) Plaintiff also described pain elsewhere: "I tingle all over. And it can—I have muscle twitching. It'll start at one place and then it'll stop and maybe go to another place. The pain of the shooting will start in my shoulder, go to my neck, start from my neck, go to the outside of my body. It just shoots all over at any time." (Tr. 72.) Plaintiff testified to taking Neurontin, Vicodin (750 mg), and Valium to manage his pain. (Tr. 65.) He also noted that he was approved to use marijuana, that he used a topical treatment called "Biofreeze," and that he took baths in a combination of Epsom salt, grain alcohol, and "a powder milk substance." (Tr. 65.)

Aside from pain, Plaintiff testified to several other impairments. He said he had to use the bathroom six to eight times per night and twice per hour during the day. (Tr. 70.) Somewhat relatedly, Plaintiff stated that he had difficulty sleeping at night; in total, however, Plaintiff said he slept 12 hours each day. (Tr. 70.) Plaintiff also stated, "I have headaches every day. It all depends on what degree of headaches because I can, you know, have migraines and it gets so bad to where it could be a migraine headache." (Tr. 71.) Plaintiff stated that he had migraines three or four times per week and that "the migraines could stay all day. And that's when I go in the room, turn off the lights, and just complete silence, darkness, to try to just like meditate." (Tr. 71-72.)

As far as functioning, Plaintiff stated that he could walk "[m]aybe a block, block-and-a-half." (Tr. 66.) He said he could stand for "at the most 30 minutes." (Tr. 67.) When asked if there were

10

problems with sitting, Plaintiff responded, "At times [there] is. Yes, [there] is. Because if I sit too much, then that's when I start to feel the pain from my back going down to my leg." (*Id.*) Plaintiff testified to being able to sit for "maybe about 30 minutes." (*Id.*) He said he could lift about 15 pounds. (*Id.*) Plaintiff noted that he did not do household chores because "home care" helped with those. (Tr. 64.) He did, however, testify to doing an hour of "very light" yoga each day: "So what I do is I can, you know, have my hands out, closed, it's just, you know, move my wrists, you know, move my arms very quietly. I'll lift, you know, sit in a chair and lift my legs up, you know, twirl my legs, you know, do steady positions and just stretch . . . ." (Tr. 76.)

In addition to obtaining Plaintiff's testimony, the ALJ also solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations he believed approximated Plaintiff's. The ALJ first asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of the exertional demands of "light" work, *see* 20 C.F.R. § 404.1567(b), but would be limited to "frequent[] climbing of ladders, ropes, or scaffolds, ramps or stairs, [frequent] balancing, stooping, crouching, [and] occasional kneeling and frequent crawling." (Tr. 82.) The expert testified that this individual could perform Plaintiff's past work as a crane operator. (*Id.*)

The ALJ then asked the vocational expert about a hypothetical individual limited to the exertional demands of "sedentary" work, *see* 20 C.F.R. § 404.1567(a), but that this individual "should never climb ladders, ropes, or scaffolds, may frequently climb ramps or stairs, balance, stoop, crouch, may only occasionally kneel and only occasionally crawl." (Tr. 83.) To account for pain and fatigue, the ALJ further limited this second hypothetical person to "simple" tasks "performed in a work environment free of fast paced production requirements and involving only

11

simple work-related decisions and with few, if any, workplace changes." (*Id.*) The expert testified that this individual could work as a surveillance system monitor, an "order checker," or an "information clerk," each with more than 1,000 jobs in Michigan's lower peninsula. (Tr. 83.)

Last, the ALJ asked about a third hypothetical person, the same as the second except that this individual needed to be able to sit or stand at will (but would still stay on task at least 90 percent of the day). (Tr. 84.) The vocational expert believed that this individual would be able to perform the same jobs as the second hypothetical person. (Tr. 84.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

12

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Dunn found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of December 18, 2009. (Tr. 14.) At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, fibromyalgia, and osteopenia. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 14.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that claimant must have the option to sit or stand alternatively, at will, except that this activity will not cause the claimant to be off task more than ten percent of the workday; the claimant may frequently balance, stoop, crouch, climb ramps and stairs; the claimant may occasionally kneel and crawl, but may never climb ladders, ropes or scaffolds; the claimant, precautionary of pain and fatigue, may only engage in a jobs process that involves the performance of simple, unskilled tasks, not to exceed specific vocational preparation factors one or two (as defined by the Dictionary of Occupational Titles), which takes place in a work environment free of fast-paced production requirements, which involve only simple work-related decisions and which contemplates few, if any, workplace changes.

(Tr. 15.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

13

(Tr. 18.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 18-19.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his March 7, 2011 decision. (Tr. 19.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is

limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff claims that the ALJ reversibly erred in discounting the severity of his fibromyalgia-related symptoms. (Pl.'s Mot. Summ. J. at 7-12.) To this end, Plaintiff makes several arguments. First, Plaintiff claims that the ALJ erroneously found that his fibromyalgia symptoms have improved. (*Id.* at 7-8.) Second, Plaintiff contends that the ALJ erred by searching for objective findings corroborating Plaintiff's claims about the severity of his fibromyalgia. (*Id.* at 8-9.) Third and relatedly, Plaintiff claims that the ALJ erred in discounting his credibility because Plaintiff engaged "'in doctor and pharmacy "shopping."'" (*Id.* at 10 (quoting Tr. 17).) Fourth, Plaintiff asserts that the ALJ made a "critical error" in failing to note that Plaintiff needed to use the restroom at least twice an hour during the day. (*Id.* at 11.) Last, Plaintiff claims that he suffers from the very fibromyalgia symptoms noted in Social Security Ruling 12-2p and that the ALJ "improperly discounted the significance of these symptoms based upon misreadings of the record and an inappropriate search for objective medical support beyond the diagnostic criteria set forth by the medical experts and SSR 12-2p." (*Id.* at 11-12.)

15

As an initial matter, Plaintiff's arguments fail to the extent that they allege that the ALJ violated Social Security Ruling 12-2p. (*See* Pl.'s Mot. Summ. J. at 11-12; *see also id.* at 9, 11.) As the Commissioner points out, Ruling 12-2p was not effective until after Plaintiff's case became administratively final on June 19, 2012. Accordingly, neither the ALJ nor the Commissioner had any obligation to comply with a then-non-binding Ruling.[4]

As for Plaintiff's fifth argument, to the extent it goes beyond Ruling 12-2p, it reads as a summary of the other four claims of error. (*See* Pl.'s Mot. Summ. J. at 11-12.) Accordingly, the Court will not address that argument separately.

Plaintiff's second argument relies on *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Plaintiff is correct that in *Rogers*, the Sixth Circuit explained that "fibromyalgia patients present no objectively alarming signs" and "fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion." *Id.* 243-44 (internal quotation marks omitted). And the Court also agrees with Plaintiff that, in discussing his fibromyalgia, ALJ Dunn stated, "physical examinations included in the record have been routinely, albeit not universally, normal such as those dated January 13, 2010, March 31, 2010 and June 2, 2010, each of which reported functional range of motion, although with some pain, in all joints, in all directions, no focal motor or neurological deficits and with five out of five strength throughout (10F/10, 5, 3)." (Tr. 16.) The Court, however, cannot agree with Plaintiff's conclusion: that the ALJ "erred in denying

---

[4]"Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent[ial] final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273, n.1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)). Social Security Ruling 12-2p became effective and thus "binding" on the Administration on July 25, 2012.

plaintiff's claim in part based upon the lack of objective test results that simply would not be expected." (Pl.'s Mot. Summ. J. at 9.)

The statement from *Rogers* must be taken in context, which, as it turns out, is not akin to the one presented to this Court. In *Rogers*, two of the claimant's long-time treating physicians opined as to the severe limiting effects of the claimant's fibromyalgia, including, that the claimant "could lift only five pounds and could sit and stand for no more than one hour in an eight-hour workday." 486 F.3d at 237. In the course of addressing the claimant's argument that the ALJ should have credited the findings of her physicians over those who merely reviewed her medical file, the Court found that "the ALJ's decision reflects some hesitancy in identifying this accepted medical condition as a severe impairment, and this hesitancy, in turn, influenced the ALJ's weighing of the treating physician evidence." *Id.* at 243. Indeed, the ALJ in *Rogers* did not find the claimant's fibromyalgia to be a severe impairment at step two, *id.* at 241, which, the court noted, is only a "de minimus hurdle," *id.* at 243 n.2. The Sixth Circuit explained how the ALJ's focus on objective testing to marginalize the claimant's fibromyalgia was error:

> As in [*Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815 (6th Cir. 1988) (per curiam) (holding that ALJ erred in concluding that the claimant did not suffer from fibromyalgia based primarily upon objective evidence demonstrating fairly normal clinical and test results)], the ALJ's decision here impliedly dismissing or minimizing Rogers' fibromyalgia and instead accepting the non-treating doctors' opinions as to her limitations from "arthralgias" was not based upon substantial evidence. As noted, the process for diagnosing fibromyalgia involves testing for tenderness in focal points and ruling out other conditions. . . . The medical evidence submitted by Rogers' treating physicians . . . is replete with references to observed tender points in the "classic fibromyalgia distribution." In addition, [Rogers' physicians] recorded ongoing complaints of intense pain and stiffness throughout Rogers' body, as well as fatigue. Finally, [one of Rogers' physician's] notes for his course of treatment evidence a process of diagnoses elimination, as

17

he sought to determine whether Rogers' symptoms resulted from fibromyalgia and/or rheumatoid arthritis. Again, this was neither acknowledged nor discussed by the ALJ.

Other factors tend to support affording the opinions of Rogers' treating physicians' significant weight. . . .

486 F.3d at 244.

Here, ALJ Dunn's narrative does not suggest the same fundamental misunderstanding of fibromyalgia. For one, ALJ Dunn found that Plaintiff's fibromyalgia was a severe impairment. (Tr. 14.) In fact, as Plaintiff recognizes, he stated that while Plaintiff's reported "chronic pain, exacerbated with exertion and excessive fatigue" was not fully credible, it was "consistent with [the] diagnosis [of fibromyalgia]." (Tr. 16.) Further unlike *Rogers*, the ALJ did not credit the findings of non-examining physicians over the findings of long-time treating physicians in part because of his "hesitancy in identifying this accepted medical condition as a severe impairment," 486 F.3d at 243. Indeed, Plaintiff makes no treating-source argument in this case. And even taking *Rogers'* statement that "fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion" apart from its context, the Court does not understand it to bar all reliance on physical evaluations of a claimant with fibromyalgia—especially when those evaluations inform an ALJ as to the claimant's ability to function despite his fibromyalgia. Accordingly, the Court does not believe that Plaintiff has shown that the ALJ reversibly erred in relying—in part—on the fact that Plaintiff's "physical examinations included in the record have been routinely, albeit not universally, normal," (Tr. 16).

Plaintiff's remaining three claims of error can all be considered together because they are all, at bottom, a challenge to the ALJ's determination that his testimony was not fully credible. The ALJ noted that Plaintiff's fibromyalgia improved in the context of discounting Plaintiff's testimony.

18

(*See* Tr. 16.) The ALJ also allegedly rejected or overlooked testimony that Plaintiff needed to use the restroom at least twice an hour during the day. (*Id.* at 11.) And Plaintiff has explicitly identified the third claim of error, which involves the ALJ's finding of "pharmacy shopping," as a challenge to the ALJ's credibility assessment. (Pl.'s Mot. Summ J. at 10.)

That these three claims are in essence a challenge to the ALJ's credibility determination makes Plaintiff's task on appeal difficult: a court must accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying," *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Indeed, the Sixth Circuit has said that "[c]laimants challenging the ALJ's credibility findings face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005). Further still, even a defective credibility analysis can sometimes be excused as harmless error. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) with approval); *Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." (quotation marks omitted and punctuation altered)).

With this deferential framework in mind, the Court now turns to the specifics of Plaintiff's three remaining arguments. The ALJ reasoned that Plaintiff's testimony should be discounted because Plaintiff dishonestly obtained scheduled substances:

> there is evidence that the claimant has engaged in drug seeking behavior, in that [Dr. Gordon] refused to prescribe controlled medications after the claimant was found to have engaged in doctor and pharmacy "shopping" (10F/4). The requisite subterfuge inherent

19

> in these activities renders somewhat unreliable nearly all of the
> information received from the claimant.

(Tr. 17.) Plaintiff states that the treatment note that the ALJ relied upon to reach his conclusion in

fact "includes no indication of doctor or pharmacy shopping, drug seeking behavior, or subterfuge."

(Pl.'s Mot. Summ. J. at 10.) The note provides:

> Given our [recent] change in practice . . . for . . . strict[er] compliance
> with scheduled substance prescription[s], we do have [the Michigan
> Automated Prescription System], which show[s] some inconsistency
> with more than one physician and more than one pharmacy. As such,
> I discussed . . . with [the patient] that our policy is that this is a
> violation of our contract. He acknowledges this. I gave him the
> options of prescribing a final taper and recommendation for detox
> versus deferring to his other primary physician. He is going to think
> about it, but for now [is] wanting to defer to the primary physician,
> but also acknowledges that I will no longer be prescribing controlled
> substance.
>
> * * *
>
> Given the above discussion, we no longer may order a prescription
> for controlled substances deferring elsewhere for the time being.

(Tr. 358.) The Court agrees with Plaintiff that Dr. Gordon's statement does not explicitly state that

Plaintiff engaged in "pharmacy shopping, drug seeking behavior, or subterfuge," (Pl.'s Mot. Summ.

J. at 10).

But a reasonable decision-maker could think that Dr. Gordon implicitly said as much. In

particular, the ALJ could have reasonably believed that Plaintiff sought and obtained controlled

substances from Dr. Gordon without informing him that Dr. Hudson was contemporaneously

providing similar substances. In fact, Dr. Gordon provided that he did not discover this conduct

because Plaintiff ultimately informed him, but instead because of his search of the Michigan

Automated Prescription System. Notably, MAPS "enables . . . practitioner[s] to determine if patients

20

are receiving controlled substances from other providers and to assist in the prevention of prescription drug abuse." Michigan Department of Licensing and Regulatory Affairs, Michigan Automated Prescription System, http://www.michigan.gov/lara/0,4601,7-154-35299_63294_63303_55478---,00.html (last visited June 24, 2013). Indeed, Dr. Gordon thought that Plaintiff's conduct was severe enough to constitute a "violation" of their contract and to justify immediate stoppage with Plaintiff's treating physician left to manage the situation. All of this supports the ALJ's conclusion that Plaintiff "engaged in drug seeking behavior."

As to the second of Plaintiff's credibility-based arguments, he is correct that the ALJ's reason for inferring that his fibromyalgia had improved "some" is not supported by substantial evidence. The ALJ reasoned:

> The claimant's reported symptoms of chronic pain, exacerbated with exertion and excessive fatigue (hearing testimony) are consistent with [a] diagnosis [of fibromyalgia]; however, by report dated January 13, 2010, the claimant's treating physician rendered a prognosis of "difficult, but good" (10F/11). Moreover, by June 2, 2010, *the claimant was registering tenderness on eleven of eighteen trigger points, representing some improvement* (10F/3).

(Tr. 16 (emphasis added).) Apparently, the ALJ's reference point for this conclusion was Dr. Yahia's March 2009 finding that Plaintiff had "18 tender trigger points." (Tr. 217.) But, as Plaintiff correctly observes, Dr. Gordon in fact found that Plaintiff had "more" than 11 out of 18 tender trigger points in June 2010. (Tr. 363; *see also* Tr. 355, 357, 359.) Dr. Gordon probably thought it unnecessary to specify the precise number of tender trigger points because 11 points (along with other findings) suffices to diagnose fibromyalgia. *See* S.S.R. 12-2p, 2012 WL 3104869, at *3 & n.4 (citing Frederick Wolfe et al., *1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 Arthritis and Rheumatism 160 (1990)). Accordingly, the Court

21

agrees with Plaintiff that the ALJ's reason for finding "some improvement" is not supported by substantial evidence.

The Court does not agree that this error warrants remand, however. In particular, the ALJ gave several other reasons, supported by substantial evidence, for discounting Plaintiff's testimony. *See Ulman*, 693 F.3d at 714; *Carmickle*, 533 F.3d at 1162. The Court has already discussed the ALJ's reasonable inference based on Plaintiff's use of two doctors to obtain scheduled drugs. Two other of the ALJ's credibility rationales were also reasonable. For one, the ALJ reasonably found that Plaintiff's reports of his daily activities and functioning were in tension with his statements of disabling symptoms. In his self-completed function report, Plaintiff stated that he was able to walk his dog on occasion (Tr. 167), wash clothes and dishes (albeit very slowly) (Tr. 168), and go grocery and clothes shopping (Tr. 169). Plaintiff also testified that he could walk a block or block-and-a-half, stand for 30 minutes, sit for 30 minutes, and lift 15 pounds. (Tr. 66-67.) These activities must be viewed alongside the ALJ's residual functional capacity assessment limiting Plaintiff to (1) "sedentary" work, which involves only two hours of standing or walking in an eight-hour day and lifting 10 pounds at one time, *see* 20 C.F.R. § 404.1567(a), (2) a sit-stand option and, (3) to account for Plaintiff's "pain and fatigue," "simple, unskilled tasks" in "a work environment free of fast-paced production requirements" with "few, if any, workplace changes." (Tr. 15.) The ALJ could have reasonably thought that Plaintiff's testimony that his fibromyalgia limited him beyond these three significant limitations was in tension with the activities and abilities he reported. For another, Plaintiff testified that his most significant pain was his back pain which radiated down his right leg. (Tr. 63.) But the ALJ rightly noted that a November 2008 EMG was negative for radiculopathy (Tr. 16, 287), and that, in August 2008, Plaintiff reported no pain when performing lumbar and thoracic

22

range-of-motion testing (Tr. 16, 371). The ALJ also noted that Dr. Gordon found in January, March, and June 2010, that Plaintiff's joints had a full range of motion—this finding naturally includes Plaintiff's lumbar spine. (Tr. 16.) The Court adds that Plaintiff's April 2010 MRI showed only a "small" L5-S1 herniation and a "very small" L4-L5 herniation (Tr. 240) and that Dr. Gordon noted in January 2010 that Plaintiff's MRI did not show anything "compatible with any acute radiculopathy either in the past or presently" (Tr. 363). Accordingly, even if the ALJ's inference of improvement was not a valid basis for discounting Plaintiff's testimony, the ALJ provided several other reasons, supported by substantial evidence, for discounting Plaintiff's allegations of limitations beyond those set forth in the residual functional capacity assessment.

The Court similarly concludes that the ALJ's failure to fully appreciate the severity of Plaintiff's frequent urination is only harmless error. The ALJ stated: "The claimant does treat [his back] condition with a regimen of prescription medication, including narcotic painkillers and muscle relaxers, the only known side effect of which is involuntary nighttime incontinence (hearing testimony)." (Tr. 16.) Plaintiff reasonably argues his frequent urination may be due to fibromyalgia as opposed to a medication side effect. *See* S.S.R. 12-2p, 2012 WL 3104869, at *3 n.9; (Tr. 68 ("With fibromyalgia I tend to use the bathroom a lot.")). Further, as Plaintiff asserts, the ALJ may have overlooked the fact that Plaintiff's full testimony also described the need to use the bathroom frequently during the day:

> [HUDSON] I use the bathroom a lot at night.
> [COUNSEL] How many times at night?
> A Average six to eight . . . times.
> Q And how many times do you go to the bathroom during the day?
> How often?
> A *At least twice an hour.*

(Tr. 70 (emphasis added).)

23

But the Court is again not convinced that the ALJ's failure to completely recount Plaintiff's testimony about his need to frequently use the bathroom justifies remand. There is nothing about frequent urination in the medical records from the disability period. Additionally, there is no testimony or other evidence indicating how long Plaintiff's bathroom breaks needed to be. This void is significant because the vocational expert testified that even if someone was off task close to 20 percent of the time, they could still perform the simple, unskilled jobs he identified. (Tr. 85-86.) As this percentage equates to about 12 minutes per hour, the Court is not persuaded that even if Plaintiff needed to use the restroom two times every hour, he would be unable to perform the jobs identified by the vocational expert. Plaintiff offers only speculation to the contrary: "the VE testified that there would be no jobs for plaintiff if he was off task for 25% of the day (Tr 84-85)[;] [this] might be the case with twice-hourly bathroom breaks." (Pl.'s Mot. Summ. J. at 11.) Plaintiff's speculation is not sufficient to show harmful error. *See Shinseki v. Sanders*, 556 U.S. 396 (2009) (holding that the burden is on the party attacking the Department of Veterans Affairs' decision to prove that Department's error was not harmless); *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2010) (applying the holding in *Shinseki* to social security disability cases).

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that Plaintiff has not demonstrated that the ALJ reversibly erred in assessing the functional limitations attributable to Plaintiff's fibromyalgia. Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 14) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

24

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

Dated: July 8, 2013

---

### PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on July 8, 2013.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson